UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

**DOUBLE R FARMS SOKY, LLC**                                                                  **PLAINTIFF**

v.                                                                                            **NO. 1:22-CV-118-BJB**

**THE ANDERSONS, INC.**                                                                       **DEFENDANT**

### MEMORANDUM OPINION & ORDER

Double R Farms, SoKY, a limited liability company grain farm in Springfield, Tennessee, allegedly entered several contracts to sell grain and other crops to The Andersons, an Ohio-based agricultural company. Motion to Compel Arbitration (DN 6) at 2.[1] The Andersons demanded the grain from Double R in January of 2022, invoiced Double R for more than $275,000 when it didn't deliver, and finally followed up with an arbitration demand. Double R responded by suing in state court, alleging the contracts (including the arbitration provisions) are invalid as the product of fraud, misrepresentation, and negligence. Complaint (DN 1-2) ¶¶ 45–67. After The Andersons removed the case, the parties filed dueling motions to compel and stay arbitration.

Both motions join issue on one question: whether the parties validly entered into an agreement to arbitrate this contract dispute. The record shows they did—and that the arbitration agreement covers this dispute. So the Court grants the motion to compel arbitration and denies Double R's motion to stay arbitration.

### I. Allegations

This dispute—like several related cases[2]—emerged from a soured relationship between The Andersons and a grain farm. According to Double R, it began selling

---

[1] The Sixth Circuit, in another dispute over arbitration, described The Andersons (at least its 1990s incarnation) as "a multi-division/location agri-business firm headquartered in Maumee, Ohio, in the business of originating, merchandising, conditioning, and storing grain and grain products, and other agri-businesses." *The Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 313 (6th Cir. 1998).

[2] Similar cases and practically identical motions are pending before this Court in other suits. The same counsel represents The Andersons and the farmer-plaintiffs in these cases, and the Court (with the parties' agreement) held a combined hearing on June 12, 2023, that covered each case. *See* Case Nos. 1:22-cv-115, 1:22-cv-117, 3:22-cv-472, 3:22-cv-473, 3:22-cv-474. The plaintiffs in these cases, including Double R, also previously brought suit against the agents that allegedly induced them to sign. *Alford v. Brooks*, 618 F. Supp. 3d 621 (E.D.

1

excess grain to The Andersons and its predecessor, through its agents in 2019. Complaint ¶¶ 6–11. In June 2020, Double R and one agent for The Andersons entered an agreement to sell 75,000 bushels of corn at a price floor of $3.80 each. ¶¶ 12–13. At some point, corn prices began to rise, and Double R asked for delivery details; The Andersons' agent stated that delivery was not necessary and there would be no future exposure on this transaction. ¶¶ 15–16. Double R alleges that agents for The Andersons (Boyd Brooks and Aaron Lloyd) then emailed three separate times over following to request signatures on documents—which Double R indisputably signed—that would memorialize the June agreement. ¶¶ 17–26.

The parties' disjointed contracting process probably shouldn't serve as a model for law students learning how to clearly memorialize agreements. The documents they shared were all dated or shared electronically in a manner that didn't necessarily track the parties' relationship on the ground. Two such documents bear on the parties' agreements and this Court's resolution of the arbitration request: the Invoice Contracts and the Additional Terms.

This dispute concerns two "Invoice Contracts." *See* DN 1-1 at 11–12. They are dated June 29, 2020 and April 23, 2021, but the signatures are dated February 5, 2021 and May 18, 2021, respectively. *Id.* And each identifies May 2021 as the relevant "Futures Month." *Id.* They contain the electronic signatures of Cliff Arfman on behalf of The Andersons and Brandon Robey (as agent and sole member of the LLC) on behalf of Double R; each additionally states that "failure to [sign and return] will be construed as an acceptance." An agent for The Andersons (Aaron Lloyd) allegedly emailed Double R on multiple occasions and asked Double R to sign two contracts and a revised contract, which he attached to each email message. Complaint ¶¶ 17–26. Each is a single page, with "Page 1 of 2" at the bottom. *Id.* Above each signature line, the contract contained a sentence stating "Parties Accept Additional Terms Attached" in bolded letters. *See* DN 1-1 at 11–12.

Each email attaching these Invoice Contracts also included a copy of a "Contract Terms and Conditions" sheet. *See* Renewed Motion to Stay (DN 9) at 3; Motion to Compel at 2. This sheet says "Page 2 of 2" at the bottom and contains a statement that "any disputes or controversies arising out of this Contract shall be arbitrated by the NGFA pursuant to its Arbitration Rules." Contract Terms & Conditions (DN 1-1) at 14 ¶ 2; Complaint ¶ 26. Robey, on behalf of Double R, signed each of the Invoice Contracts (though how he transmitted the signed contracts remains unclear). But the Contract Terms and Conditions pages didn't contain a signature line and are unsigned. Complaint ¶ 26.

---

Ky. 2022). Unlike the other related cases, this case does not involve a "Flex Ageement." That doesn't change the result, however, because the Invoice Contracts compel arbitration.

In the months that followed, the contractual relationship deteriorated and (according to the Complaint) the grain market turned significantly. ¶¶ 15–16, 28–31. The deadlines set out in the invoices came and went, but Double R didn't deliver any crops to the company related to the disputed contracts. ¶¶ 28–30. In February 2022, The Andersons invoiced Double R for $276,562.50 based on its failure to deliver on these crop-sale contracts. ¶ 30. In March, The Andersons initiated arbitration proceedings against Double R before the NGFA based on the arbitration language in the Invoice Contracts. *See* Notice of Removal (DN 1) ¶¶ 1, 5; Arbitration Letter (DN 1-1) at 2–3. Then, in August, Double R filed a lawsuit against The Andersons alleging that the contracts were the product of fraud and negligence and seeking a stay of the arbitration proceedings. Complaint ¶¶ 38–67. The Andersons removed that lawsuit to this Court and filed this motion to compel arbitration. Notice of Removal ¶ 1; Motion to Compel at 1–2. Double R filed a combined (and renewed) motion to stay the arbitration proceeding and response to the motion to compel. *See* DNs 9, 10 ("Renewed Motion to Stay").

## II. Arbitrability

The Andersons moved to compel arbitration under Section 4 of the Federal Arbitration Act. 9 U.S.C. § 4. The FAA establishes a strong federal policy in favor of arbitration and mandates the enforcement of written agreements to arbitrate. *See, e.g.*, *KPMG LLP v. Cocchi*, 565 U.S. 18, 21–22 (2011). But before a court may compel arbitration of a contract claim, it must determine that the parties agreed to arbitrate the dispute. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). That is, if one side contests "whether a valid arbitration agreement exists," the Court must be satisfied that "neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 879 (6th Cir. 2021) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010)) (cleaned up).

Here, the parties accept that the arbitration provision—if enforceable—would cover this dispute. *Cf. AT&T Techs. v. Comm. Workers of Am.*, 475 U.S. 643, 650 (1986) (arbitration must be compelled unless it's clear that "the arbitration clause is not susceptible of an interpretation that covers the asserted dispute") (citation omitted). The question is whether that arbitration provision is valid. When that question is "in issue," the Court must proceed to trial to determine if the parties formed a valid arbitration agreement. *Great Earth Companies v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002) (citing 9 U.S.C. § 4). To place validity in issue, "the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement." *Id.* All issues of contract formation and interpretation are governed by Kentucky law. *See In re StockX*, 19 F.4th at 881, 881 n.4.

3

Double R argues that "there were no provisions for arbitration" on any of "the alleged pages to which [an agent for Double R] affixed his signature." Renewed Motion to Stay at 7. The Andersons, for its part, points to the signed Invoice Contracts. Motion to Compel at 12–15. Because both Invoice Contracts are enforceable, this supplies a sufficient basis to enforce arbitration of this dispute.

The terms of these documents sufficiently justify the motion to compel arbitration. Each agreement contains language above the signature line stating that the "Parties Accept Additional Terms Attached." DN 1-1 at 11–12. The only attached terms sent with the Invoice Contracts were the "Page 2 of 2" Contract Terms and Conditions page. That document includes a provision stating that "any disputes or controversies arising out of this Contract shall be arbitrated by the NGFA pursuant to its Arbitration Rules." Contract Terms & Conditions ¶ 2. Based on the record before the Court, the only Page 2 that would sensibly accompany the Invoice Contracts—each marked with "Page 1 of 2"—is the Contract Terms and Conditions page including the arbitration provision. And although Double R acknowledges receiving a "Page 2 of 2" in the same email as the "Page 1[s]," it offers no alternative explanation for what the "Page 2" might connect to if not the accompanying pages. *See* Complaint ¶ 26; Renewed Motion to Stay at 3, 7–8. Double R, through its agent, indisputably signed the Invoice Contracts, though it didn't sign the single accompanying Contract Terms and Conditions page ("Page 2 of 2").

Does the lack of a signature on page 2 mean, as Double R argues, that it did not validly agree to an arbitration provision when it signed on page 1? Renewed Motion to Stay at 7 ("The pages the Plaintiff signed clearly make no reference to arbitration."). In *Dixon v. Daymar Colleges Group*, the Kentucky Supreme Court held that a signature on the front page of a two-page document failed to assent to an arbitration provision on the second page. 483 S.W.3d 332, 346 (Ky. 2015). The Statute of Frauds (KRS § 371.010), the court observed, applied and mandated a signature at the end of the document under KRS § 446.060: "When the law requires any writing to be signed by a party thereto, it shall not be deemed to be signed unless the signature is subscribed at the end or close of the writing." *Dixon*, 483 S.W.3d at 344.

But *Dixon* also recognized that "the statute [KRS § 446.060] does not abolish incorporation by reference." *Id.* And the invoice contracts in this case contain clear language stating that the parties accept the additional attached terms. *See* DN 1-1 at 11–12. To validly incorporate terms by reference: (1) the contract must contain "clear language expressing the incorporation of other terms," and (2) it "must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." *Dixon*, 483 S.W.3d at 344 (approvingly citing *Bartelt Aviation, Inc. v. Dry Lake Coal Co.*, 682 S.W.2d 796, 798 (Ky. Ct. App. 1985), for the proposition that an arbitration agreement may be incorporated by reference) (cleaned up); *see also Univ.*

*of Ky. v. Regard*, 670 S.W.3d 903, 912–13 (Ky. 2023) (collecting cases). These requirements are all satisfied here: the incorporation language is clear, it appears in bold typeface, and the record shows that Double R had the additional terms in its possession. *See* Complaint ¶ 26 ("The alleged contracts ... also included a 'Page 2 of 2....'"). Because Double R signed a page agreeing to incorporation language, "it is a logical inference that the signer agrees to be bound by everything incorporated." *Dixon*, 483 S.W.3d at 344 (quotation marks omitted).

Double R argues that *Dixon* applies to these terms and defeats arbitrability because the single copy of the "Page 2 of 2" Contract Terms and Conditions is the second page of each Invoice Contract—not a freestanding document incorporated by reference. True enough, one of the reasons the Terms and Conditions pairs with the Invoice Contracts is because of the imperfect but reasonable association between the page numbers of these documents. But the "Page 2 of 2" Contract Terms and Conditions is better understood as an attachment incorporated by reference. The Invoice Contracts expressly incorporate "Additional Terms Attached," the only additional terms were indeed attached to the agent's email as the Contract Terms and Conditions, and the terms were *not* a part of a single connected document but rather a separate "Attached" file. This aligns with the concept of incorporating a separate document, not including "hidden" terms at the bottom of a contract. *Cf. Dixon*, 483 S.W.3d at 344–46 (citing incorporation-by-reference decisions).

No evidence in the record and no language in any of the documents rebuts The Andersons' position that the Invoice Contracts incorporated the Contract Terms and Conditions by reference—just as the disclaimer ("Additional Terms Attached") stated. So the signed Invoice Contracts offer a sufficient basis to enforce the arbitration provision set out in the Contract Terms and Conditions.

## ORDER

Because the record indicates the parties entered into valid arbitration agreements, the Court grants the motion to compel arbitration (DN 6), denies the motion to stay arbitration (DN 9), and stays this case pending the result of the arbitration proceeding.

Benjamin Beaton, District Judge
United States District Court

September 26, 2023